# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

————————————

Nº 10-CR-74 (JFB)

————————————

## UNITED STATES OF AMERICA,

VERSUS

## GIOVANNI PRADO, ET AL.,

Defendants.

————————————

MEMORANDUM AND ORDER
August 5, 2011

————————————

JOSEPH F. BIANCO, District Judge:

On March 3, 2011, defendants Giovanni Prado ("Prado"), Erick Alvarado ("Alvarado"), Elenilson Ortiz ("Ortiz"), Francisco Ramos ("Ramos"), and Wilber Ayala-Ardon ("Ayala-Ardon") (collectively, "defendants") were charged in a superseding indictment with a number of crimes, including: racketeering and racketeering conspiracy (including predicate acts of conspiracy to distribute cocaine, attempted murder, tampering with a witness and bribery of a witness), in violation of 18 U.S.C. §§ 1962(c) and 1962(d); conspiracy to distribute cocaine, in violation of 21 U.S.C. § 846; assault in aid of racketeering resulting in serious bodily injury, in violation of 18 U.S.C. § 1959(a)(3); conspiracy to commit assault in aid of racketeering with a dangerous weapon, in violation of 18 U.S.C. § 1959(a)(6); attempted murder in aid of racketeering, in

violation of 18 U.S.C. § 1959(a)(5); assault with a dangerous weapon in aid of racketeering, in violation of 18 U.S.C. 1959(a)(3); threatening to commit violent crimes in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(4); witness tampering, in violation of 18 U.S.C. § 1512(b)(1)-(3); conspiracy to murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(5); conspiracy to commit obstruction of justice murders, in violation of 18 U.S.C. §§ 1512(k) and 1512(a)(3); and discharge of a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(ii)-(iii).[1] Several co-defendants with whom

---

[1] Specifically, Prado, Ortiz, and Alvarado were each charged with one count of conspiracy to commit assault with a dangerous weapon; one count of attempted murder; one count of assault with a dangerous weapon; and one count of threatening to commit crimes of violence. Prado also was charged with one count of racketeering (including the predicate acts of conspiracy to

these defendants originally were scheduled to go to trial pled guilty prior to the Court's oral decision on the government's and defendant Prado's motions.

Prior to trial, Ortiz and Alvarado each filed motions for severance. The Court denied Ortiz's motion in an oral ruling on January 10, 2011 and denied Alvarado's motion for substantially the same reasons in an oral ruling on March 17, 2011. Subsequently, the government filed a motion to empanel an anonymous and partially sequestered jury. Prado and Alvarado each filed a written opposition to the government's motion, and Ortiz, Ramos, and Ayala-Ardon orally joined in this opposition. In addition, Prado filed a motion to change venue pursuant to Federal Rule of Criminal Procedure 21(a). On May 26, 2011, after hearing oral argument, the Court granted the government's motion for an anonymous jury and denied Prado's motion for a change of venue, and stated that a written opinion would follow with a detailed analysis of the basis for these rulings. This Memorandum and Order

distribute cocaine and attempted murder); one count of racketeering conspiracy; one count of conspiracy to distribute cocaine; one count of assault resulting in serious bodily injury. Ortiz also was charged with one count of racketeering (including the predicate acts of attempted murder, witness tampering, and attempted extortion); one count of racketeering conspiracy; and two counts of witness tampering. Ramos was charged with two counts of conspiracy to commit assault with a dangerous weapon; one count of assault resulting in serious bodily injury; one count of conspiracy to murder; one count of conspiracy to commit obstruction of justice murders. Finally, Ayala-Ardon was charged with two counts each of attempted murder, assault with a dangerous weapon, and discharge of a firearm during a crime of violence.

contains the detailed analysis of the Court's decisions.

## I.  MOTION FOR ANONYMOUS AND PARTIALLY SEQUESTERED JURY

The government has moved for the empanelment of an anonymous and partially sequestered jury. In particular, the government requests: (1) that the names, addresses, and places of employment of the prospective jurors not be revealed to either the parties or their attorneys, and (2) that the jurors be directed to park in the employee parking lot and enter and exit the courthouse through the employee entrance for the duration of trial. Both Prado and Alvarado object to the empanelment of an anonymous jury on the grounds that jury anonymity is not necessary in this case and would unfairly prejudice the defendants and infringe upon their Fifth and Sixth Amendment rights. Prado also objects to partially sequestering the jury during trial.

For the reasons set forth herein, the Court grants the government's motion in its entirety. Specifically, the Court finds that maintaining jury anonymity and partially sequestering the jury as proposed by the government is warranted here in light of the defendants' and their associates' alleged history of witness tampering and related offenses, combined with their alleged membership in a large-scale, violent gang with numerous members still at liberty— who have both the means and a demonstrated willingness to obstruct justice—and given the seriousness of the pending charges against defendants in this case. Moreover, the Court concludes that it will be able to take reasonable precautions to minimize any prejudicial effects on defendants and to ensure that their fundamental rights are protected. Accordingly, the Court concludes that the use of an anonymous and partially

sequestered jury is appropriate here and will not infringe upon the defendants' constitutional rights.[2]

## A. Legal Standard

The Second Circuit has explained that empaneling an anonymous jury "may be warranted when the jury needs protection, as when the government has demonstrated a defendant's willingness to tamper with the judicial process, or when there has been extensive pretrial publicity in cases involving allegations of violent conduct." *United States v. Thai*, 29 F.3d 785, 801 (2d Cir. 1994) (internal quotation marks, citations, and alterations omitted). "In such circumstances, the use of an anonymous jury does not infringe a defendant's constitutional rights, so long as the court conducts a careful *voir dire* designed to uncover any bias as to the issues or the defendants and takes care to give the jurors a plausible and nonprejudicial reason for not disclosing their identities." *United States v. Aulicino*, 44 F.3d 1102, 1116 (2d Cir. 1995). In reviewing a challenge to the use of an anonymous jury, a court must "balance the defendant's interest in conducting meaningful *voir dire* and in maintaining the presumption of innocence, against the jury member's interest in remaining free from real or threatened violence and the public interest in having the jury render a fair and impartial verdict." *United States v. Amuso*, 21 F.3d 1251, 1264 (2d Cir. 1994). Accordingly, "[a]s a general rule, a district court may order the empaneling of an anonymous jury upon '(a) concluding that there is strong reason to believe the jury needs protection, and (b) taking reasonable

precautions to minimize any prejudicial effects on the defendant and to ensure that his fundamental rights are protected.'" *United States v. Stewart*, 590 F.3d 93, 124 (2d Cir. 2009) (quoting *United States v. Paccione*, 949 F.2d 1183, 1192 (2d Cir. 1991)).

As to the first factor, the mere invocation of words such as "organized crime" or "mob" is insufficient to warrant jury anonymity. *United States v. Vario*, 943 F.2d 236, 241 (2d Cir. 1991). Instead, "something more" must be shown, such as "a demonstrable history or likelihood of obstruction of justice on the part of the defendant or others acting on his behalf or a showing that trial evidence will depict a pattern of violence by the defendants and his associates such as would cause a juror to reasonably fear for his own safety." *Id.* Evidence that a defendant or his codefendants have engaged in obstruction of justice—which indicates a defendant's willingness to tamper with the judicial process—"has always been a crucial factor" in determining that a jury needs protection. *Id.* at 240; *accord United States v. Quinones*, 511 F.3d 289, 295 (2d Cir. 2007) ("We have identified strong reasons to believe that a jury needed protection in situations where the government demonstrated a defendant's willingness to tamper with the judicial process.").

Notably, to support a finding that an anonymous jury is warranted, obstruction of justice charges need not relate to prior jury tampering efforts, but instead may relate solely to efforts to tamper with witnesses or otherwise obstruct the judicial process. For example, in *Quinones*, defendants were charged with murdering a confidential informant in retaliation for his cooperation with law enforcement authorities. 511 F.3d at 295. Defendants argued that their conduct "did not actually threaten the judicial

---

[2] Based on the allegations in the government's papers, the Court concludes in its discretion that an evidentiary hearing on the government's motion is not necessary. *See United States v. Aulicino*, 44 F.3d 1102, 1116 (2d Cir. 1995).

process," but the Second Circuit disagreed, noting that the murder of the witness "threatened the judicial process both by eliminating a witness who could have provided incriminating evidence against defendants and by sending a powerfully frightening message to others of the terrible consequences awaiting anyone who cooperated in defendants' prosecution." *Id.* at 295-96. Accordingly, the Court held that the district court acted "well within its discretion in concluding that the defendants posed a substantial risk to the integrity of the judicial process warranting empanelment of an anonymous jury." *Id.* at 296; *see also Thai*, 29 F.3d at 801 (upholding decision to empanel anonymous jury where government made motion "based in large part on evidence of defendants' acts of intimidation toward their crime victims, their attempts to kill certain of those victims, and the murder of [a victim] because of his refusal to retreat from his complaints to the police" and where the government "maintained that jurors whose identities were disclosed would be at risk because [the gang] had at least 100 members, many of whom were not in custody"); *Aulicino*, 44 F.3d at 1116 (anonymous jury warranted where, *inter alia*, co-conspirators allegedly sought to bribe a witness in their federal case, attempted to influence a witness in a prior state prosecution, and were caught on tape indicating that defendant's father would interfere with the judicial process on defendant's behalf).

Moreover, the fact that allegations of obstruction of justice may have been made only against certain co-defendants does not provide grounds for a severance motion for those defendants not alleged to be involved in such obstruction efforts. By way of example, in *Aulicino*, the defendant, who had been convicted on one count of conspiracy to kidnap, argued on appeal that the district court should have granted his motion for severance after it decided to empanel an anonymous jury because "there was no proffer of evidence linking [Aulicino] to any efforts to obstruct justice." 44 F.3d at 1116. In rejecting this argument, the Second Circuit explained that "[t]here is a preference in the federal system for the joint trial of defendants indicted together, making severance inappropriate unless a joint trial would compromise a trial right of the moving defendant or prevent the jury from making a reliable judgment about guilt or innocence." *Id.* Merely using an anonymous jury, however, did not violate Aulicino's constitutional rights:

> In light of our conclusion that the use of an anonymous jury was based on sufficient evidence of potential jury tampering by Aulicino's coconspirators and was accompanied by an adequate proffer to the jury of a nonprejudicial reason for anonymity, we conclude that Aulicino's due process rights were not violated even in the absence of evidence that he in particular had sought to obstruct justice.

*Id.* at 1117; *see also United States v. Carneglia*, 47 F. App'x 27, 32 (2d Cir. 2002) ("[T]he District Court did not abuse its discretion by denying Carneglia's severance motion once it determined that there was a strong reason for Scala's jury to remain anonymous. Even if Carneglia's participation in the extortion and Gravano's allegations that Carneglia has murdered in the past would be insufficient to justify empaneling an anonymous jury to decide the charges against him if he were on trial alone, we have held that, where one co-defendant warrants an anonymous jury, the other co-defendant's due process rights are not violated by a refusal to sever . . . ."); *United States v. Scala*, 405 F. Supp. 2d 450, 453 n.18 (S.D.N.Y. 2005) (same).

Furthermore, in addition to considering a defendant's and his associates' prior attempts to interfere with the judicial process, courts in the Second Circuit have also considered other factors in determining whether there is strong reason to believe that the jury needs protection, including the seriousness of the crime ("including whether the defendant is charged with participating in a large-scale criminal enterprise, and the defendant's criminal history," *United States v. Wilson*, 493 F. Supp. 2d 397, 398 (E.D.N.Y. 2006)), the means of the defendant and his associates to interfere with jurors, and the likelihood of media attention in the trial. For example, in *Amuso*, the indictment alleged that the defendant had committed crimes of "extreme violence" and that he was the "head of a powerful crime organization." 21 F.3d at 1264. In holding that the district court's decision to empanel an anonymous jury was adequately supported, the Second Circuit noted that the crimes charged showed not only that the defendant "was willing to interfere with the judicial process by murdering government witnesses" but also that, as the head of an organized crime family, the defendant certainly "had the means to interfere with the jurors if he so desired." *Id.* at 1264-65. Moreover, the Second Circuit noted that the district court's decision did not improperly rely upon Amuso's affiliation with organized crime, but instead had appropriately considered the alleged organized crime affiliation "along with other evidence which provided a reasonable basis from which the trial court concluded that precautionary measures were required." *Id.* at 1265 (citations omitted).

Similarly, in *Wilson*, the defendant was charged with the intentional murder of two undercover police officers. 493 F. Supp. 2d at 399. In finding that the use of an anonymous jury was warranted, the court relied not only upon the seriousness of the offense, but also upon the fact that: (1) the defendant was part of a large-scale violent gang with a history of murder, robbery, and narcotics trafficking; (2) the gang had other members and associates who would remain at large during trial and, as such, the defendant was in a position, through his associates who remained at liberty, to interfere with the jury; (3) the defendant and his associates had a history of interference with the judicial process, including ordering a fellow prisoner to attack a corrections officer and coercing witnesses not to testify or cooperate with authorities; and (4) there was extensive media attention in the case. *Id.* at 399-400.

As another example, in *United States v. Young*, 385 F. App'x 12 (2d Cir. 2010), the defendant, a purportedly low-level member of an organized crime family, was alleged to have engaged a "horrific pattern of violence," including the murder and dismemberment of an associate who had "boasted excessively." *Id.* at 14 (internal quotation marks omitted). Although it was "unclear precisely what duty the family owed to [the defendant] and to what lengths the family might go in order to assist him," the Second Circuit nonetheless upheld the district court's decision to empanel an anonymous jury where not only had the government made "a sufficient showing of the [organized crime] organization's willingness to subvert the judicial process," but the evidence at trial also indicated that the defendant "was willing to subvert the proceedings by inducing another to provide him with a false alibi," and there was significant media interest in the trial. *Id.* (internal quotation marks and citations omitted); *see also United States v. Blackshear*, 313 F. App'x 338, 342 (2d Cir. 2008) ("We have identified several factors which might be considered in deciding whether to empanel an anonymous jury. Among them are (1) the defendant's capacity to threaten jurors; (2) defendant's

prior attempts to interfere with the judicial process; and (3) the likelihood of publicity." (citations omitted)); *Quinones*, 511 F.3d at 296 ("Two other grounds cited by the government—the seriousness of the crime and the likelihood of pre-trial publicity—reinforce the district court's decision to empanel an anonymous jury." (citations omitted)); *Thai*, 29 F.3d at 801 (empaneling of anonymous jury was appropriate where, *inter alia*, "[the gang] had at least 100 members, many of whom were not in custody").[3]

Significantly, while the seriousness of an offense is a relevant consideration, the offenses at issue need not involve violence for the court to conclude that an anonymous jury is warranted. *See United States v. Locasio*, 357 F. Supp. 2d 558, 561 (E.D.N.Y. 2005) ("The defendants seek to distinguish this case from many of those in which anonymous juries have been ordered

on the grounds that the charges do not involve violence. It is true that no element of the charges requires proof of any assaultive or violent act, and it is unclear at this point whether any evidence of violence will be elicited at trial. But this distinction misses the point. The concern in this case is not that anonymity is necessary to assuage jurors' fears for their personal safety. Rather, the concern is that if jurors['] identities are revealed they can easily be contacted and offered bribes.").

As noted *supra*, once the Court concludes that there is strong reason to believe the jury needs protection, the Court must then take reasonable precautions to minimize any prejudicial effects on the defendant and to ensure that his fundamental rights are protected. *Paccione*, 949 F.2d at 1192. Such precautions include extensively questioning jurors during *voir dire* to explore prospective jurors' biases and providing the jurors with a neutral explanation for the anonymity that does not negatively implicate the defendants. *See, e.g.*, *Quinones*, 511 F.3d at 296 ("The district court's *voir dire* was sufficiently detailed to compensate for jury anonymity, and the court couched its jury instruction regarding anonymity in such a way as to avoid intimating that defendants posed any risk to persons or to the judicial process." (internal citations omitted)); *United States v. Wong*, 40 F.3d 1347, 1377 (2d Cir. 1994) (finding that the district court took reasonable precautions where it "questioned prospective jurors about their familiarity with the case, the defendants and the crime scenes, and inquired about their neighborhoods, marital status, employment, spouse's and children's employment, education, organizational affiliations, ethnicity, military service, and other matters," which "was more than sufficient to enable the defendants to exercise their challenges meaningfully, and to obtain a fair

---

[3] Although it is unclear whether factors such as the seriousness of an offense or extensive pretrial publicity, standing alone, would support the use of an anonymous jury, the cases cited *supra* and others in this Circuit demonstrate that such factors undoubtedly are relevant when considered in conjunction with each other or in conjunction with evidence of a defendant's willingness or ability to tamper with the judicial process. *See, e.g.*, *Quinones*, 511 F.3d at 296 (declining to decide whether seriousness of offense and extensive publicity were sufficient, standing alone, where there was also evidence of defendants' willingness to subvert the judicial process); *United States v. Paccione*, 949 F.2d 1183, 1192-93 (2d Cir. 1991) (upholding district court decision to preserve jury anonymity given, *inter alia*, "the serious nature of the charges and the potential for long prison terms and high monetary penalties," and defendants' membership and strong ties to organized crime, as well as defendants' alleged involvement in the murder of a co-defendant and other acts of witness tampering).

and impartial jury" (internal quotation marks and citations omitted)); *Paccione*, 949 F.2d at 1193 ("We see no inadequacy in the procedural precautions taken by the court to prevent prejudice to the defendants as a result of the anonymity of the jurors. Defendants do not contend that the *voir dire* was in any way inadequate. The court also adequately instructed the jury at the outset of the trial that the special precautions were designed to protect the jury from contacts by the media, thereby implying that the security measures were not the result of threats from the defendants.").

## B. Application

As noted *supra*, defendants are charged with a number of serious offenses stemming from their alleged involvement in La Mara Salvatrucha ("MS-13"), a street gang that the government contends is involved in a variety of violent, criminal acts, including murder, attempted murder, narcotics trafficking, extortion, witness tampering, and witness retaliation. (*See* Third Superseding Indictment ("S-3") ¶¶ 1-2.) Specifically, Prado, Alvarado, and Ortiz are jointly charged with conspiring to assault and attempting to murder, in aid of racketeering, an unidentified individual (referred to in the Third Superseding Indictment as "John Doe #6"), in connection with a November 2009 assault on John Doe #6 with a baseball bat. (*Id.* Counts 36-38.) Prado, Alvarado, and Ortiz are also charged with conspiring to assault and threatening to commit crimes of violence, in aid of racketeering, against other individuals, namely, "John Doe #7" and "John Doe #8." (*Id.* Counts 36, 39.) In addition, particularly relevant for the current motion, Ortiz is charged with witness tampering for threatening John Doe #6 in an attempt to coerce John Doe #6 into not testifying before the Grand Jury and not providing law enforcement officials with information regarding the assaults allegedly committed against him and others by Prado, Alvarado, and Ortiz. (*Id.* Count 40.) Ortiz is also charged with racketeering, with the alleged attempted murder, tampering, and bribery of John Doe #6, among other things, as predicate acts (*id.* Count 1), and is alleged to have tampered with another witness in connection with a separate incident (*id.* Count 67). Ramos also is charged with an obstruction-related offense, namely, conspiracy to commit obstruction of justice murders of three individuals. (*Id.* Count 69.) Finally, Ayala-Ardon also is charged with several serious crimes, including attempted murder, assault with a dangerous weapon, and discharge of a firearm during a crime of violence.

As an initial matter, these charges plainly are serious charges—the majority of which involve the use of violence—that support the Court's conclusion that the use of an anonymous jury is appropriate in this case. *See, e.g., Quinones*, 511 F.3d at 296 ("[T]he seriousness of the crime . . . reinforce[s] the district court's decision to empanel an anonymous jury."); *Wilson*, 493 F. Supp. 2d at 399 ("[T]he Defendant is charged with intentionally murdering two police officers in an attempt to obstruct justice. These charges are of the utmost seriousness, indeed as serious as any charge can be, and demonstrate both the extreme dangerousness of the defendant and a willingness to obstruct justice. Based on these charges alone, I would seriously consider empaneling an anonymous jury."). Although defense counsel argues that these charges do not demonstrate that jurors would be at risk because "there is apparently no evidence that the Defendants were ever violent to anyone who was not either a member of MS-13 or of a rival gang" (Prado Mem. of Law at 5 n.5), this argument is unavailing. In fact, contrary to Prado's contention, the government asserts that John

Doe #6 (the victim of Prado, Alvarado, and Ortiz's alleged assault and the target of Ortiz's witness tampering efforts) and John Doe #8 (another alleged assault victim of Prado, Alvarado, and Ortiz) were not members of any street gang. (Gov't Reply at 11.) Moreover, many of the victims of the crimes charged in the indictment against various other alleged MS-13 members also were not members of any gang. (*See id.* (noting that John Doe #11, Jane Doe #1, Jane Doe #2, and other victims were not members of any gangs).)[4]

---

[4] Defense counsel also argues that "[a]llowing the level of criminal allegations to drive the Court's deliberation in consideration of the government's request for an anonymous jury . . . would be to allow the tail to wag the dog." (Prado Mem. of Law at 5.) This argument, however, ignores the clear precedent in this Circuit establishing that the seriousness of the charges a defendant is facing is a relevant consideration in deciding whether to empanel an anonymous jury. *See, e.g.*, *Quinones*, 511 F.3d at 296; *Wilson*, 493 F. Supp. 2d at 399. Furthermore, Prado contends that the "laundry list" of serious charges in this case was "designed to frighten and intimidate the trial jury" and that no jury, "when faced with this daunting list of charges, would return not guilty verdicts against all defendants on all charges." (Prado Mem. of Law at 5.) Prado even goes so far as to argue that the intent of the government in bringing these charges was "to instill fear in the jury in order to more reliably secure convictions." (*Id.* at 6.) This argument is plainly without merit. There is no indication whatsoever that the government brought these charges in bad faith, or that the charges were brought for any purpose other than convicting defendants for crimes which the government believes defendants committed. In the absence of any evidence to the contrary, the Court rejects any contention that the government acted improperly here and, accordingly, the Court rejects Prado's argument that the seriousness of the charges he is facing should play no role in the Court's analysis.

In any event, even more important for purposes of the government's motion than the serious and violent nature of the crimes charged in the indictment is the fact that defendants and their associates have evinced a clear willingness to interfere with the judicial process. As already described, Ortiz not only is charged with witness tampering, but, in fact, is charged with tampering with one of the victims whom Prado, Alvarado, and Ortiz are charged with allegedly attempting to murder. Ramos is also charged with conspiring to murder three individuals—two of whom, according to the government, were not members of any gang—to prevent these individuals from cooperating with law enforcement and testifying regarding assaults committed by Ramos, Prado, and other MS-13 members. As noted *supra*, the fact that Prado, Alvarado, and Ayala-Ardon were not individually charged with witness tampering does not alter the Court's conclusion that the use of an anonymous jury is appropriate here, particularly in light of the fact that Prado, Alvarado, and Ayala-Ardon are alleged to be part of, or to have aided, the same racketeering enterprise. *See, e.g.*, *Aulicino*, 44 F.3d at 1117 ("In light of our conclusion that the use of an anonymous jury was based on sufficient evidence of potential jury tampering by Aulicino's coconspirators and was accompanied by an adequate proffer to the jury of a nonprejudicial reason for anonymity, we conclude that Aulicino's due process rights were not violated even in the absence of evidence that he in particular had sought to obstruct justice.").

Moreover, other alleged members of defendants' gang, with whom defendants originally were scheduled to go to trial, were charged with witness tampering involving the alleged victims of Prado, Alvarado, and Ortiz's crimes, as well as other victims, and have already pled guilty to these offenses.

For example, defendant Emilio Saballos pled guilty to racketeering and admitted to committing witness tampering involving John Doe #7 and John Doe #8—whom Prado, Alvarado, and Ortiz allegedly conspired and threatened to assault (*see* S-3 Counts 36, 39) and who allegedly witnessed the purported assault of John Doe #6 (Gov't Reply at 5-6)—on behalf of the MS-13 gang and in an attempt to prevent cooperation with law enforcement officials. (*See* Docket Entry 467.) In addition, defendant Jose Salazar Erazo pled guilty to witness retaliation in connection with the alleged assault of John Doe #7. (*See* Docket Entry 324.) During his guilty plea, Erazo allocuted that the baseball bat assault of John Doe #7 was committed in retaliation for John Doe #7's perceived cooperation with the government in connection with the attempted murder and assault of John Doe #6. (Gov't Reply at 6.)[5]

The Court finds that these allegations of witness tampering and witness retaliation demonstrate a clear willingness on the part of some of the defendants and the enterprise

---

these allegations in reaching its holding here. *See Locasio*, 357 F. Supp. 2d at 562 ("The government points to other information establishing the dangerousness of the defendants. Much of the proffer, however, carries little, if any, weight due to the failure of the government to provide adequate support for its allegations. The Court declines to rely upon 'confidential source information' where there is no indication of the reliability of such information."). Nevertheless, the Court finds that both the charges in the indictment and the guilty pleas of co-defendants in this case are more than sufficient, for purposes of the pending motion, to provide "strong reason" to believe that defendants and their associates are willing to obstruct justice and that the jury here needs protection. Thus, to the extent that defendants are arguing that all of the government's allegations (including those in the superseding indictment) are unfounded and should be disregarded, the Court disagrees. What crimes a defendant has been charged with in an indictment and whether any co-defendants have pled guilty to obstruction-related charges are both relevant and appropriate considerations in determining whether to empanel an anonymous jury. *See, e.g.*, *Quinones*, 511 F.3d at 295 ("Defendants submit that there was no basis for the district court's finding that they posed a substantial risk to the judicial process. The record is plainly to the contrary. The indictment specifically charged defendants with murdering a confidential informant in retaliation for his cooperation with law enforcement authorities."); *Locasio*, 357 F. Supp. 2d at 561-62 (anonymous jury warranted where, *inter alia*, defendant was indicted for witness tampering and thus the "grand jury found probable cause to believe that these payments were made 'knowingly and intentionally . . . to corruptly persuade' the witness not to communicate information to law enforcement officers about the very case before the Court," and co-defendant had pled guilty to obstruction of justice).

---

[5] The government also indicated that they would present evidence at trial that Ortiz threatened another inmate at the Nassau County Correctional Center whom Ortiz believed to be cooperating with law enforcement. (Gov't Reply at 7.) Additionally, the government asserts that "multiple witnesses at trial will testify about additional incidents of witness tampering and witness retaliation directed at them and their families, which are not charged in the indictment." (Gov't Mem. of Law at 5.) Defendants raise a general objection to these and other allegations in the government's papers, arguing that the allegations the government relies upon in its motion are vague and unsupported and, thus, should be disregarded by the Court. (*See, e.g.*, Prado Mem. of Law at 7-9; Alvarado Letter at 6.) Prado also objects to the government's reliance on the potential testimony of the "multiple witnesses" on the ground that such evidence is neither relevant nor admissible. (Prado Mem. of Law at 8-9.) First, as to the claims regarding Ortiz's actions at the jail or what testimony certain unidentified witnesses might provide, the Court has not relied upon

as a whole to interfere with the judicial system and weigh strongly in favor of empaneling an anonymous and partially sequestered jury. *See, e.g.*, *Vario*, 943 F.2d at 239-40 ("We are satisfied that two circumstances surrounding this case, the grand jury tampering charge and the expected publicity, justified the trial court's decision to empanel an anonymous jury. . . . An obstruction of justice charge, particularly one involving jury tampering, has always been a crucial factor in our decisions regarding anonymous juries. Although Vario may not have personally spoken to the grand jury witness, his co-conspirator took the act in furtherance of the conspiracy. Since it is a fundamental tenet of the law of conspiracy that reasonably foreseeable acts of individual co-conspirators taken in furtherance of the conspiracy count against all members equally, Vario's argument is unavailing." (citations omitted)); *United States v. Tutino*, 883 F.2d 1125, 1132-33 (2d Cir. 1989) (empanelment of anonymous jury was justified where defendants had serious criminal records and a history of jury tampering, as evidenced by affidavits submitted by three jurors who had been approached in connection with a prior narcotics case and evidence that one of the defendants was personally involved in jury tampering); *Wilson*, 493 F. Supp. 2d at 400 ("The [affidavit submitted by the government] attests to the Defendant's and his associates' history of interference with the judicial process. Specifically, while the Defendant was in state custody . . . [defendant] ordered another prisoner to attack a corrections officer and the other prisoner did so. Moreover, there are instances of [defendant's] criminal associates having attempted to coerce witnesses not to testify or cooperate with authorities . . . . This history of interference with the judicial process also warrants the use of an anonymous, semi-sequestered jury,

as requested by the Government."). In addition, despite defendants' argument to the contrary, the fact that these incidents did not involve jurors, but instead related to witnesses, does not change the Court's conclusion. *See Quinones*, 511 F.3d at 295-96 (murder of a confidential informant "threatened the judicial process both by eliminating a witness who could have provided incriminating evidence against defendants and by sending a powerfully frightening message to others of the terrible consequences awaiting anyone who cooperated in defendants' prosecution"); *accord Blackshear*, 313 F. App'x at 343 ("Although none of [defendant's] prior incidents involved jurors, he consistently attempted to obstruct justice—by bribing witnesses and by intimidating witnesses. . . . It does not seem unreasonable to infer that jurors might also be threatened.").

Furthermore, as to the defendants' means to interfere with the judicial process, defendants are alleged to be members of MS-13, which the government contends is a large-scale criminal enterprise with members located not only throughout Long Island and Queens, but also throughout the United States and in Central America. (*See* S-3 ¶ 1; Gov't Mem. of Law at 4.) As demonstrated by the witness tampering and retaliation offenses to which several defendants in this case have already pled guilty, the members of MS-13 plainly have the means and a willingness to interfere with the judicial system. Moreover, according to the government, many of MS-13's leaders and members remain at liberty on Long Island (*see* Gov't Mem. of Law at 4) and, thus, would have the ability to interfere with defendants' trial. Additionally, the government has presented strong reason to believe that the members of MS-13 are willing and able to engage in violent criminal behavior: in addition to the serious charges outlined *supra* against Prado,

Alvarado, Ortiz, Ramos, and Ayala-Ardon, fifteen other defendants in this case have been charged with one or more murders in aid of racketeering and other related offenses. (*See generally* S-3.) Although a history of violent behavior is not required to empanel an anonymous jury, evidence of such a history is relevant to the Court's analysis. Taken together, the Court finds that these allegations—namely, that the defendants are members of a large-scale criminal enterprise with a history of violence, a demonstrated willingness and ability to tamper with the judicial process, and numerous members still at liberty—weigh strongly in favor of jury anonymity. *See Thai*, 29 F.3d at 801 (upholding decision to empanel anonymous jury where government made motion "based in large part on evidence of defendants' acts of intimidation toward their crime victims, their attempts to kill certain of those victims, and the murder of [a victim] because of his refusal to retreat from his complaints to the police" and where the government "maintained that jurors whose identities were disclosed would be at risk because [the gang] had at least 100 members, many of whom were not in custody"); *Amuso*, 21 F.3d at 1264-65 (district court properly granted motion for anonymous and sequestered jury where defendant was charged with crimes of "extreme violence" and "[t]he crimes charged also showed that Amuso was willing to interfere with the judicial process by murdering government witnesses and, as head of the Luchese crime family, it was certainly reasonable to expect that Amuso had the means to interfere with the jurors if he so desired"); *United States v. Persico*, 832 F.2d 705, 717 (2d Cir. 1987) (upholding decision to empanel an anonymous jury where district court based its decision on "the violent acts alleged to have been committed in the normal course of Colombo Family business, the Family's willingness to corrupt and obstruct the criminal justice system, and the extensive publicity this case is expected to continue to attract" (internal quotation marks omitted)); *Wilson*, 493 F. Supp. 2d at 399-400 ("[I]n addition to the charges of murdering [two police officers], the indictment also alleges that the Defendant is part of a criminal enterprise known as the "Stapleton Crew," a violent organization that engages in acts of robbery, murder and narcotics trafficking. . . . In short, the Defendant's criminal history and his participation in a large scale criminal enterprise without question show that he is dangerous and weigh heavily in favor of using an anonymous, partially-sequestered jury in this trial."); *Locasio*, 357 F. Supp. 2d at 562 ("The organized crime status of the defendants, although not alone sufficient to support empaneling an anonymous jury, is plainly not irrelevant. The indictment charges that Richard Martino was a soldier in the Gambino crime family and that Locasio was a capo. Thus Martino, who himself has shown a willingness to corrupt the judicial process, also has strong and influential ties to an organization whose members have a documented history of seeking to tamper with juries and who could provide the support necessary to achieve that objective."); *accord Young*, 385 F. App'x at 14 (although it was unclear what lengths organized crime family might go to in order to assist a low-level member, empaneling an anonymous jury was warranted where the government made a "sufficient showing" of the family's "willingness to subvert the judicial process" and evidence at trial also indicated the defendant was willing to "subvert the proceedings by inducing another to provide him with a false alibi").

Accordingly, the Court finds that the government has alleged "something more" here than a mere link to organized criminal activity or a gang, and instead has made a showing of "a demonstrable history or

likelihood of obstruction of justice on the part of the defendant or others acting on his behalf [and] a showing that trial evidence will depict a pattern of violence by the defendants and his associates such as would cause a juror to reasonably fear for his own safety." *Vario*, 943 F.2d at 241. Thus, the Court concludes that there is a "strong reason to believe that the jury needs protection" in this case. *Stewart*, 590 F.3d at 124; *accord United States v. Thomas*, 757 F.2d 1359, 1364-65 (2d Cir. 1985) ("The circumstances of this case support the trial judge's decision to impanel an anonymous jury. The defendants were alleged to be very dangerous individuals engaged in large-scale organized crime who had participated in several 'mob-style' killings. Charges in the indictment accused defendants of attempts to interfere with the judicial process by murdering government witnesses. . . . [T]here was strong evidence of defendants' past attempts to interfere with the judicial process, and defendants were alleged to be part of a group that possessed the means to harm jurors.").[6]

---

[6] The Court notes that, although the media interest in this case has not been overwhelming, there nevertheless have been a number of press reports related to the charges in this indictment. (*See* Gov't Mem. of Law at 10 n.10 (citing articles).) Thus, while this factor does not weigh as heavily in the Court's analysis as the factors discussed above, the existence of such pre-trial publicity does provide further support for the Court's decision to empanel an anonymous and partially-sequestered jury. *See Quinones*, 511 F.3d at 296 ("[T]he likelihood of pre-trial publicity . . . reinforce[s] the district court's decision to empanel an anonymous jury." (collecting cases)); *Vario*, 943 F.2d at 240 ("Vario also argues that the publicity surrounding this case was so minimal that it did not warrant an anonymous jury. We are unpersuaded. Pre-trial publicity may militate in favor of an anonymous jury because it can enhance the possibility that jurors' names would

Having reached this conclusion, the Court must take "reasonable precautions to minimize any prejudicial effects on the defendant and to ensure that his fundamental rights are protected." *Stewart*, 590 F.3d at 124. Defendants argue, however, that no such precautions exist and that granting the government's motion for an anonymous and partially sequestered jury will violate defendants' Fifth Amendment right to due process and Sixth Amendment right to an impartial jury. Specifically, defendants contend that, regardless of any explanation given to the jurors by the Court, the jurors inevitably will know that they are being protected from the defendants, and they consequently will be biased against the defendants from the start of trial. (Prado Mem. of Law at 12-13; Alvarado Letter at 3.)

The Court rejects defendants' arguments. As an initial matter, it is well-established that "'when genuinely called for and when properly used, anonymous juries do not infringe a defendant's constitutional rights.'" *Thai*, 29 F.3d at 800-01 (quoting *Vario*, 943 F.2d at 239.) Thus, to the extent defendants are arguing that the use of an anonymous jury will automatically bias the jury pool by creating "an atmosphere of fear and intimidation,"[7] that argument is without

---

become public and thus expose them to intimidation by defendants' friends or enemies, or harassment by the public. At the time of the government's anonymous jury motion in the district court, *New York Newsday* had recently published a cover story about the case entitled *The Mob and Local 66*. . . . Although no publicity followed this initial article, we cannot say that at the time that the anonymous jury motion was made, the government's prediction that publicity would continue was unreasonable or unjustified." (internal quotation marks omitted)).

[7] *See* Prado Mem. of Law at 12; Alvarado Letter at 3.

merit. Indeed, the Second Circuit has repeatedly held that a defendant's presumption of innocence is properly maintained where the court gives a neutral and non-prejudicial explanation to the jury regarding the need for anonymity. *See, e.g.*, *Thai*, 29 F.3d at 801 ("In order to provide a nonprejudicial reason for maintaining anonymity, the introduction to the questionnaire stated, with the approval of the parties, that '[s]electing an anonymous jury is not an unusual practice and has been followed in many cases in Federal Court. Anonymity will ward off curiosity that might infringe on a juror's privacy. . . .' . . . [T]he court's questionnaire properly protected defendants' interests both in the selection of unbiased jurors and in the proffer of a nonprejudicial reason for the preservation of juror anonymity. We find no abuse of discretion in the use of an anonymous jury in the present case."); *Paccione*, 949 F.2d at 1193 ("We see no inadequacy in the procedural precautions taken by the court to prevent prejudice to the defendants as a result of the anonymity of the jurors. . . . The court . . . adequately instructed the jury at the outset of the trial that the special precautions were designed to protect the jury from contacts by the media, thereby implying that the security measures were not the result of threats from the defendants."); *Tutino*, 883 F.2d at 1133 (holding that "any risk that the empanellment [sic] of an anonymous jury might deprive defendants of the presumption of innocence was minimized by Judge Leval's instructions to prospective jurors" in which the district court stated, in pertinent part, "'It is a common practice followed in many cases in the Federal court to keep the names and identities of the jurors in confidence. This is in no way unusual. It is a procedure being followed in this case.'"). Defendants have made no attempt to distinguish these cases and, indeed, the Court does not find that this trial presents such unique circumstances that the instructions typically used for an anonymous jury will not suffice to guard against any undue prejudice or bias against defendants here.

Prado also objects to the use of an anonymous jury on the ground that it will prevent him from meaningfully exercising his peremptory challenges during jury selection. In particular, Prado contends that "[i]n light of counsel's access to the internet and its many tools of investigation and research, not having the name or address of the prospective jurors is a distinct disadvantage to counsel in analyzing the jurors' suitability for a case of this nature. . . ." (Prado Mem. of Law at 10.) The Court, however, finds this argument to be without merit and, instead, finds that the defendants' right to a fair and impartial jury will be sufficiently protected by a careful and searching *voir dire*, which will be designed to uncover bias and consequently will allow defendants to meaningfully exercise their challenges. *See Aulicino*, 44 F.3d at 1116 (where otherwise warranted, "the use of an anonymous jury does not infringe a defendant's constitutional rights, so long as the court conducts a careful *voir dire* designed to uncover any bias as to the issues of the defendants and takes care to give the jurors a plausible and nonprejudicial reason for not disclosing their identities" (citations omitted)); *Vario*, 943 F.2d at 241-42 ("[T]he district court conducted a searching *voir dire* which sufficiently enabled Vario to exercise his challenges meaningfully and to obtain a fair and impartial jury." (citations omitted)); *Tutino*, 883 F.2d at 1133 ("Judge Leval conducted an extensive and thorough *voir dire*. Although the jurors' names, addresses, and places of employment were withheld, the jurors were questioned about their neighborhoods, marital status, employment,

spouse's and children's employment, education, ethnic background, military service, and, optionally, religious background, among other things. This probing inquiry was more than sufficient to enable the defendants to exercise their challenges meaningfully, and to obtain a fair and impartial jury."); *cf. United States v. Barnes*, 604 F.2d 121, 140 (2d Cir. 1979) ("As long as a defendant's substantial rights are protected by a *voir dire* designed to uncover bias as to issues in the cases and as to the defendant himself, then reasonable limitations on the questioning should not be disturbed on appeal.").

Thus, the Court finds that it will be able to take adequate precautions—namely, by giving the jury a neutral explanation for the precautionary measures and by conducting a detailed *voir dire*—to protect defendants from any undue prejudice stemming from the use of an anonymous and partially sequestered jury. *See United States v. Gotti*, 459 F.3d 296, 345 (2d Cir. 2006) ("Gotti does not argue that reasonable precautions were not taken to minimize prejudicial effects. Nor can he, as the precautions set forth in *Paccione*—conducting a thorough voir dire and providing the jurors with a plausible and nonprejudicial reason for not disclosing their identities—were followed here. The district court made use of a juror questionnaire that was jointly submitted, and instructed the jury that the special precautions had been implemented to protect them from the inquiring media." (internal citation omitted)); *Quinones*, 511 F.3d at 296 ("Defendants do not contend that the district court failed to take adequate procedural precautions to ensure that they were not prejudiced by the selection of an anonymous jury, nor would the record support such an argument. The district court's voir dire was sufficiently detailed to compensate for jury anonymity, and the court couched its jury instruction regarding

anonymity in such a way as to avoid intimating that defendants posed any risk to persons or to the judicial process." (internal citations omitted)).

Finally, the Court finds that the same reasons that warrant the use of an anonymous jury also warrant partial sequestration of the jury in the manner proposed by the government. *Cf. Gotti*, 459 F.3d at 346 (jury anonymity and partial sequestration were proper where defendants were charged with membership in a powerful organized crime family, defendants included the head of the family and a captain in the family, indictment charged two defendants with witness tampering, and there was expected to be intense media coverage); *Locasio*, 357 F. Supp. 2d at 563 (granting motion for anonymous and partially sequestered jury in light of "the seriousness of the charges, the lengthy prison sentences that convictions would entail, the evidence of Martino's efforts to interfere with the judicial process, and the ability of the defendants to enlist the resources of the Gambino crime family, an organization with a documented history of juror intimidation"). Although Prado contends that allowing the jurors to park in the employee lot and use the employee entrance will unduly prejudice him, the Court finds that such prejudice can be avoided through the use of the same neutral instruction that will be given to the jury regarding anonymity. *See Amuso*, 21 F.3d at 1265 ("In effectuating its sequestration order, the court told the jury that sequestration was necessary to protect the jury from being tainted by pretrial publicity. By giving the jury a neutral explanation for why sequestration was necessary, the court decreased the probability that the jury would infer that Amuso was guilty or even dangerous, thereby preserving the presumption of innocence."). Moreover, the Court notes that the Second Circuit and

other district courts have authorized the use of sequestration measures that were far more intrusive and extensive than those proposed here. *See, e.g.*, *Blackshear*, 313 F. App'x at 342-43 (affirming district court decision to empanel anonymous jury and to order that the jurors eat lunch together and be accompanied in and out of the courthouse by U.S. Marshals to avoid mingling in the courthouse); *Wilson*, 493 F. Supp. 2d at 400 (ordering that jury be sequestered as they travel to and from the courthouse and during recesses); *Locasio*, 357 F. Supp. 2d at 564 (ordering that the jurors be picked up from and dropped off at "an undisclosed central location" and transported to and from the courthouse by United States Marshals each day, and that the jurors be "escorted by the United States Marshals to and from any locations at which they may recess for lunch, when they are not lunching in the jury room"). Thus, given the strong reason to believe in this case that the jury needs protection, as discussed *supra*, the Court finds that allowing the jurors to park in the employee parking lot and to use the side entrance of the courthouse are modest and appropriate measures here to ensure the protection of the jurors and the integrity of trial. As noted above, the Court also finds that the defendants' right to a trial by a fair and impartial jury can be adequately protected through the use of a neutral and non-prejudicial instruction to the jury.

Accordingly, the Court grants the government's motion for an anonymous and partially sequestered jury in its entirety.

## II. MOTION FOR CHANGE OF VENUE

Prado has moved for a change of venue pursuant to Federal Rule of Criminal Procedure 21(a) on the ground that anti-Hispanic bias allegedly has pervaded the communities in Nassau and Suffolk Counties to such an extent that he cannot obtain a fair trial here. For the reasons set forth below, the Court finds that defendant has failed to establish that any alleged ethnic bias in the community is so pervasive and prejudicial that it has created a reasonable likelihood that a fair trial could not be conducted in the Eastern District of New York, and the Court accordingly denies defendant's motion to change venue.

### A. Legal Standard

"The Sixth Amendment secures to criminal defendants the right to a trial by an impartial jury." *Skilling v. United States*, --- U.S. ----, 130 S.Ct. 2896, 2912-13 (2010). Although criminal trials generally occur, "[b]y constitutional design, . . . 'in the State where the . . . Crimes . . . have been committed,'" *id.* at 2913 (quoting U.S. Const. art. III, § 2, cl. 3 and citing U.S. Const. amend. VI), "[t]he Constitution's place-of-trial prescriptions . . . do not impede transfer of the proceeding to a different district at the defendant's request if extraordinary local prejudice will prevent a fair trial—a 'basic requirement of due process.'" *Id.* (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)). Where a defendant raises a constitutional challenge to the venue of his trial prior to jury selection, he "must make a showing of presumed prejudice, arising when 'prejudicial publicity so pervades or saturates the community as to render virtually impossible a fair trial by an impartial jury drawn from that community.'"[8] *United States v. Volpe*, 42 F.

---

[8] The Court notes that, typically, motions to change venue are based, at least in part, on allegations that extensive pre-trial publicity has tainted the jury pool. Here, in contrast, defendant has not argued that a change of venue is warranted due to prejudicial publicity. In fact, defendant argued, in opposition to the government's motion for an anonymous jury, that this case had garnered relatively little media attention. (*See, e.g.*, Prado Mem. of Law at 12

Supp. 2d 204, 216 (E.D.N.Y. 1999) (quoting *Mayola v. Alabama*, 623 F.2d 992, 997 (5th Cir. 1980)); *cf. Murphy v. Florida*, 421 U.S. 794, 803 (1975) (Court unable to conclude that defendant did not receive a fair trial where he "failed to show that the setting of the trial was inherently prejudicial or that the jury-selection process of which he complains permits an inference of actual prejudice"). "Cases presenting this scenario are very rare, however, and have been characterized . . . as 'extreme situation[s].'" *United States v. Sabhnani*, 599 F.3d 215, 233 (2d Cir. 2010) (quoting *United States v. Campa*, 459 F.3d 1121, 1143 (11th Cir. 2006) (en banc)). Indeed, as recently explained by the Supreme Court,

> In each of [the Supreme Court cases finding a presumption of prejudice], we overturned a conviction obtained in a trial atmosphere that was utterly corrupted by press coverage; our decisions, however, cannot be made to stand for the proposition that juror exposure to news accounts of the crime alone presumptively deprives the defendant of due process. Prominence does not necessarily produce prejudice, and juror

n.9 ("It is also far from clear whether, in a case of this nature, the news media and the 'curious' would have any interest whatsoever in the names, addresses, and places of employment of the members of the jury pool. The interest level in this case is simply not that high.").) Instead, defendant argues that he cannot receive a fair and impartial trial because anti-Hispanic sentiments allegedly have pervaded the jury pool and have made it impossible to empanel an impartial jury. Nevertheless, although defendant has not based his motion upon pre-trial publicity, the Court finds the above-cited precedents to be applicable in this context and finds that, for the reasons stated herein, defendant's motion to change venue must be denied.

*impartiality*, we have reiterated, does not require *ignorance*. A presumption of prejudice, our decisions indicate, attends only the extreme case.

*Skilling*, 130 S.Ct. at 2914-15 (internal quotation marks, citations, alterations, and footnotes omitted) (emphasis in original).

Moreover, in addition to raising a constitutional challenge to venue, a defendant may move to change venue pursuant to Federal Rule of Criminal Procedure 21, which provides, in pertinent part, that "[u]pon the defendant's motion, the court must transfer the proceeding against that defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there." Fed. R. Crim. P. 21(a). To satisfy this standard, a defendant must establish that the alleged community bias is "so pervasive and prejudicial as to have created a reasonable likelihood that a fair trial could not be conducted." *Sabhnani*, 599 F.3d at 233; *see also United States v. Maldonado-Rivera*, 922 F.2d 934, 966-67 (2d Cir. 1990) ("In order to prevail on a motion under Rule 21(a), the defendant must show 'a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial.'" (quoting *Sheppard v. Maxwell*, 384 U.S. 333, 363 (1966))); *accord Campa*, 459 F.3d at 1150 ("To establish a presumption of juror prejudice necessitating Rule 21 change of venue, a defendant must demonstrate that (1) widespread, pervasive prejudice and prejudicial pretrial publicity saturates the community, and (2) there is a reasonable certainty that the prejudice prevents the defendant from obtaining a fair trial."). The ultimate determination of whether a fair trial is unlikely "is committed to the district court's discretion." *Maldonado-Rivera*, 922

F.2d at 967; *see also Skilling*, 130 S.Ct. at 2913 n.11 (noting that "district-court calls on the necessity of transfer are granted a healthy measure of appellate-court respect" and citing examples of cases where district courts had exercised their discretion to both grant and deny venue transfer motions under Rule 21).

### B. Application[9]

In support of his motion, Prado argues that he cannot receive a fair trial in this district because the recent influx of Hispanic and Latino immigrants to Long Island, and to Suffolk County in particular, allegedly has turned Long Island into "a hotbed of anti-Hispanic and anti-Latino rhetoric, political pandering, and hate-based crime" (Prado Mem. of Law at 13) which will make it difficult, according to Prado, to pick a fair and impartial jury. Citing to several news articles containing anecdotal reports of assaults and incidents of harassment committed against Hispanic immigrants

from 2000 to 2009, as well as reports that "many white Suffolk County residents" blame illegal immigrants for a decline in local property values, Prado contends that the venue for his trial must be moved "in an effort to avoid jurors imposing vigilante justice." (*Id.* at 20-21 (internal quotation marks and alterations omitted).) In support of his argument, Prado also relies upon a study conducted by the Southern Poverty Law Center which reported that "the influx of Hispanics to Greater Long Island has fueled 'nativist intolerance and hate violence [that] had been festering for years in Suffolk County.'" (*Id.* at 14 (citation omitted).) Finally, as evidence that "any Hispanic, charged with a crime of violence in Long Island, would have good reason to fear for his or her ability to secure a full and fair trial before an impartial jury" in the Eastern District (*id.* at 22), Prado points to the November 2008 killing of an Ecuadorian immigrant in Patchogue, New York, a crime which prosecutors stated "was the culmination of a campaign of violence that targeted Hispanic immigrants." (*Id.* at 20-21 (internal quotation marks and citation omitted).)

The Court finds that these isolated, anecdotal examples of violence or harassment over a nine-year period involving unrelated Hispanic immigrants who have no connection to this case are not sufficient to demonstrate that widespread ethnic prejudice has saturated the community to such an extent that the defendant cannot obtain a fair trial here. Indeed, this conclusion is underscored by the fact that there are approximately eight million people residing in the Eastern District of New York,[10] and the handful of incidents cited by defendant therefore only

---

[9] As an initial matter, the Court notes that Prado has moved for a change of venue pursuant to Rule 21(a), rather than on constitutional grounds. However, even if Prado intended to raise a constitutional challenge to venue, such a challenge would be denied for the reasons outlined herein. Specifically, the Court finds that the circumstances of this case do not present the "extreme case" where extraordinary local prejudice has prevented the fair trial of the defendant. *Cf. Skilling*, 130 S.Ct. at 2915-17 (despite magnitude of media attention, large number of victims, and well-publicized decision of co-defendant to plead guilty, failure to transfer venue of defendant in Enron trial did not violate defendant's constitutional rights where, *inter alia*, defendant was tried in the fourth most populous city in the nation, press reports were not kind but did not contain any confessions or blatantly prejudicial information, and extensive screening of jurors found jurors who had no, or only attenuated, links to Enron).

[10] The Court takes judicial notice of this fact pursuant to Rule 201 of the Federal Rules of Evidence.

involve a miniscule percentage of the population in this district. Stated otherwise, given the Hispanic population surge in Nassau and Suffolk Counties in recent years, the two-dozen incidents highlighted by defendant, which occurred over the course of nearly a decade and only in a handful of towns, involved a mere fraction of the Hispanic population on Long Island and certainly do not support the conclusion either that prejudice among the community should be presumed or that there is a reasonable likelihood that the defendant cannot obtain a fair trial.

As a threshold matter, as noted above, inherent prejudice in a community will be presumed only in the "extreme case," where, for example, the trial atmosphere was "utterly corrupted" by prejudicial coverage.[11] *Skilling*, 130 S.Ct. at 2914-15 (citations omitted). By way of example, in *Rideau v. Louisiana*, 373 U.S. 723 (1963), Rideau was charged with armed robbery, kidnapping, and murder. *Id.* at 724. Prior to jury selection, Rideau's taped confession—which showed Rideau flanked by the sheriff and two state troopers—was shown on three separate television broadcasts to audiences ranging in size from 24,000 to 53,000. *Id.* at 724-25. The parish in which Rideau was tried had a population of approximately 150,000. *Id.* at 724. In reversing the conviction and holding that the denial of Rideau's motion to change venue violated his due process rights, the Supreme Court observed that the people in the parish "had been exposed repeatedly and in depth to the

spectacle of Rideau personally confessing in detail to the crimes with which he was later to be charged," and that, as such, "[a]ny subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality." *Id.* at 726. As another example, in *Sheppard*, the Supreme Court held that defendant Sam Sheppard was deprived of a fair trial where the trial judge failed to protect him from "the massive, pervasive and prejudicial publicity that attended his prosecution." 384 U.S. at 335. Although the trial judge's refusal to take precautions against the influence of pretrial publicity might not have been enough, standing alone, to deprive Sheppard of his due process rights, the Court noted that the trial court's rulings "must be considered against the setting in which the trial was held." *Id.* at 354-55. Specifically, the Court noted that:

> [B]edlam reigned at the courthouse during the trial and newsmen took over practically the entire courtroom, hounding most of the participants in the trial, especially Sheppard. At a temporary table within a few feet of the jury box and counsel table sat some 20 reporters staring at Sheppard and taking notes. The erection of a press table for reporters inside the bar is unprecedented. . . . Having assigned almost all of the available seats in the courtroom to the news media the judge lost his ability to supervise that environment. The movement of the reporters in and out of the courtroom caused frequent confusion and disruption of the trial. And the record reveals constant commotion within the bar. Moreover, the judge gave the throng of newsmen gathered in the corridors of the courthouse absolute free rein. Participants in the trial, including the jury, were forced to run a gantlet of

---

[11] Because Prado has brought his motion prior to the commencement of jury selection, the Court need only address whether defendant has established the existence of presumed prejudice in the community and need not reach the issue of whether jury *voir dire* revealed the existence of actual prejudice in the community. *See Livoti*, 8 F. Supp. 2d at 249.

reporters and photographers each time they entered or left the courtroom. The total lack of consideration for the privacy of the jury was demonstrated by the assignment to a broadcasting station of space next to the jury room on the floor above the courtroom, as well as the fact that jurors were allowed to make telephone calls during their five-day deliberation.

*Id.* at 355. Accordingly, Sheppard's case involved more than mere pretrial publicity, but instead involved a trial that was infected with a "carnival atmosphere" that pervaded the entire trial. *Id.* at 358.

Here, in contrast, defendant has presented only anecdotal evidence from a handful of sources reporting that Hispanic immigrants in a few towns on Long Island were the targets of approximately two-dozen attacks and incidents of harassment over the course of nine years, from 2000 to 2009. This evidence falls far short of establishing a presumption that the community has been so saturated with anti-Hispanic bias that the defendants cannot obtain a fair trial here.

In any event, to the extent the reports cited by defendant demonstrate that some prejudice exists within the community, defendant has failed to show that there is a reasonable likelihood that this alleged prejudice would prevent the defendant from receiving a fair trial. In particular, the Court finds that defendant has failed to establish that any alleged community bias is so pervasive that an impartial jury could not be selected following careful *voir dire* questioning of the prospective jurors. Indeed, "[c]areful voir dire questioning is a recognized and effective tool to uncover bias" and "thorough voir dire examinations have been used in [the Second Circuit] to produce unbiased juries, even in high-profile

cases." *Volpe*, 42 F. Supp. 2d at 218 (citations omitted). For example, in *United States v. Salim*, 189 F. Supp. 2d 93 (S.D.N.Y. 2002), the defendant, who was of Arab ethnicity, had been charged in connection with the stabbing of a corrections officer and had moved to change the venue of his trial due to the "widespread pretrial publicity surrounding September 11, 2001 and the alleged prejudicial implications on the ability of Salim to receive a fair trial in the Southern District of New York." *Id.* at 94. In support of his motion, Salim submitted the results of a public opinion survey and an affidavit from a political science professor who had analyzed "the effect of pretrial publicity and emotions in a post September 11, 2001 world on the instant trial." *Id.* Significantly, the survey revealed that, when asked about the ability of jurors in their district to be fair to a perceived Arab national, nearly half (49.6%) of New Yorkers reported that they thought it would be difficult for their fellow citizens to be fair. *Id.* at 95. When compared to survey results averaged across five other districts, the percentage of New Yorkers who had answered this question in the affirmative was 14.7% higher than the number of individuals from other districts who had also answered affirmatively. *Id.* at 95 n.3. Nevertheless, the professor acknowledged that the survey data did "not provide the sort of clear and convincing empirical evidence that would mandate a change of venue" and, thus, did not support a "demonstrably true link between the deleterious impact of the events of September 11, 2001 and Salim's fair trial rights." *Id.* at 95. Consequently, the court concluded that the defendant did "not meet the high standard necessary to establish presumed prejudice so that careful voir dire questioning and other methods aimed at garnering a fair trial are rendered futile." *Id.* at 96. In so holding, the district court recognized that the September 11

attacks "had the unfortunate effect of increasing the prejudice and animosity towards Arab nationals nationwide," but the court nonetheless was "unwilling to find that there exists the rare circumstance of so great a prejudice in one of the largest and most racially, ethnically, and culturally diverse districts in the country that the Court simply could not believe, as a matter of law, the answers of jurors as to their ability to be impartial." *Id.* at 97. Accordingly, the court noted that "a careful and searching voir dire and expanded jury pool are remedies used routinely in high-profile cases and are appropriate here." *Id.*

Similarly, in *United States v. Awadallah*, 457 F. Supp. 2d 246 (S.D.N.Y. 2006), Awadallah, a citizen of Jordan and a lawful permanent resident of the United States, had been arrested as a material witness in connection with the September 11 attacks and subsequently was charged with two counts of perjury arising from his grand jury testimony. *Id.* at 247-48. After his first trial ended in a mistrial, Awadallah moved for a change of venue, arguing that evidence that the jurors had tearfully recounted their personal experiences on September 11 during deliberations, combined with the "'hostile deliberative environment' during trial were indicia of 'actual prejudice in 2006,' and that 'a second trial in the greater metropolitan area, including New York and Connecticut, would be a violation of Mr. Awadallah's constitutional rights.'" *Id.* at 249 (citations omitted). Although the court acknowledged that there was already evidence, based on juror reports from the first trial, that "bias within the jury pool affected the deliberations," the court rejected the defendant's contention that jurors in New York were "too close" to the events of September 11 to give Awadallah a fair trial. *Id.* at 252-53. Instead, the court found that a change of venue was not warranted and "agree[d] with the courts that have faced

similar circumstances and found a careful individual voir dire examination to be the most effective tool to address potential prejudice in the jury pool." *Id.* at 254.

As another example, the defendants in *Campa* had been convicted of acting and conspiring to act as unregistered Cuban intelligence agents working within the United States and for conspiracy to commit murder, and argued on appeal that "the pervasive community prejudice against the Cuban government and its agents and the publicity surrounding the trial that existed in Miami prevented them from obtaining a fair and impartial trial." 459 F.3d at 1126. The Tenth Circuit, sitting *en banc*, affirmed the defendants' convictions and held that the district court's detailed and thorough *voir dire* examination—which lasted for seven days and covered topics such as the jurors involvement in pro- and anti-Castro political groups and immigration into the United States from Cuba—rebutted any presumption of jury prejudice and was an effective means for screening potentially biased jurors. *Id.* at 1147-48. Accordingly, the Tenth Circuit held that defendants "failed to show that so great a prejudice existed against them as to require a change of venue under Rule 21, in light of the court's effective use of prophylactic measures to carefully manage individual voir dire examination of each and every panel member and its successful steps to isolate the jury from every extrinsic influence." *Id.* at 1150.

Accordingly, in cases where the arguments of alleged ethnic prejudice were stronger than those presented here—that is, in cases brought against defendants of Arab descent in post-September 11 New York and against Cuban government spies in Miami—courts have nonetheless denied motions to change venue and have held that careful *voir dire* questioning is an appropriate and

effective method for screening potentially biased jurors. In fact, one of the incidents to which Prado points in support of his motion actually serves as evidence that a thorough *voir dire* examination of the jury panel is an effective tool to ensure the empanelment of a fair and impartial jury. Specifically, Prado argues that the November 2008 killing of Marcelo Lucero, an Ecuadorian immigrant, demonstrates the existence of pervasive anti-Hispanic sentiments in the community that would prevent him from receiving a fair trial in this district. (*Id.* at 20-21.) According to Prado, the existence of pervasive community prejudice is shown not only by the fact of the killing itself, but also by the fact that jury selection in the resulting manslaughter trial took two weeks to complete, with a "stream of potential jurors disqualif[ying] themselves because of their passionate views about the county's immigrants." (*Id.* at 22.) However, Prado ignores the fact that, ultimately, a jury in that trial was empaneled and the defendant was convicted of manslaughter and gang assault, *inter alia*, and is currently appealing the imposition of a twenty-five year sentence. (Gov't Reply at 19 n.4.) Similarly, the defendants in another assault case cited by Prado were also convicted and are serving sentences of twenty-five years and twenty-five years to life. (*Id.* (citing *People v. Slavin*, 807 N.E.2d 259 (N.Y. 2004) and *People v. Wagner*, 811 N.Y.S.2d 125 (N.Y. App. Div. 2006)).) Thus, far from showing that empaneling a fair and impartial jury in this district is not possible, these case demonstrate the effectiveness of a careful and thorough *voir dire* in both screening out potentially biased jurors and selecting jurors who are able to put aside any personal biases and render a verdict based solely upon the evidence presented in court.

In sum, the Court finds that defendant has utterly failed to demonstrate that widespread and pervasive anti-Hispanic and anti-Latino sentiments have saturated the community to such an extent that there is a reasonable likelihood that defendant could not obtain a fair trial in the Eastern District of New York.[12] Accordingly, defendant's motion to change venue is denied. *See United States v. Washington*, 813 F. Supp. 269, 274-74 (D.Vt. 1993), *aff'd* 48 F.3d 73, 78 (2d Cir. 1995) (noting that "'there is no constitutional presumption of juror bias for or against members of any particular racial or ethnic groups'" and denying motion to change venue on grounds of racial bias because "the issue of racial bias is best addressed at the time of *voir dire*" (quoting *Rosales-Lopez v. United States*, 451 U.S. 182, 190 (1981)) (additional citations

---

[12] To the extent that Prado is seeking an intradistrict transfer from the Long Island courthouse to the Brooklyn courthouse, the Court notes that such a transfer is also unwarranted. As a threshold matter, the jury panel for trials held in either courthouse is drawn from the entire Eastern District of New York, which is comprised not only of Nassau and Suffolk Counties, but also of the boroughs of Brooklyn, Queens, and Staten Island. Defendant, however, has focused his arguments solely on alleged community prejudice in Suffolk County and, to a lesser extent, Nassau County, and he has not raised any argument that anti-Hispanic or anti-Latino sentiments pervade the communities in Queens, Brooklyn, or Staten Island. Thus, jurors will be summoned to the Long Island courthouse from all parts of the district, including those from which Prado does not claim any alleged bias. In any event, for the reasons stated *supra*, defendant has failed to demonstrate *any* transfer—whether intradistrict or interdistrict—is warranted under the circumstances of this case. Accordingly, to the extent defendant is seeking a within-district transfer, the Court denies this motion and stresses again that, given the large and diverse nature of the jury pool in this district, any purported prejudice can be addressed and screened-out through a comprehensive *voir dire* examination.

omitted)); *cf. United States v. Gaggi*, 811 F.2d 47, 51 (2d Cir. 1987) ("[W]e established guidelines for a district court to follow when the problem of widely disseminated publicity may prejudicially impact an ongoing criminal trial. The simple three-step process is, first, to determine whether the coverage has a potential for unfair prejudice, second, to canvass the jury to find out if they have learned of the potentially prejudicial publicity and, third, to examine individually exposed jurors—outside the presence of the other jurors—to ascertain how much they know of the distracting publicity and what effect, if any, it has had on that juror's ability to decide the case fairly.").

### III. CONCLUSION

As set forth orally on the record in Court and for the reasons set forth herein, the government's motion for an anonymous and partially sequestered jury is granted and defendant Prado's motion for a change of venue is denied.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: August 5, 2011
      Central Islip, New York

* * *

The United States is represented by Loretta E. Lynch, U.S. Attorney, Eastern District of New York, 610 Federal Plaza, Central Islip, New York 11722 by John J. Durham and Raymond A. Tierney, Assistant U.S. Attorneys. Defendant Giovanni Prado is represented by Scott Lloyd Fenstermaker, The Law Offices of Scott L. Fenstermaker, P.C., 100 Park Avenue, 16th Floor, New York, NY 10017. Defendant Erick Alvarado is represented by Robert L. Moore, Quesada & Moore, LLP, 128 Avon Place, West Hempstead, NY 11552. Defendant Elenilson Ortiz is represented by Robert P. LaRusso, LaRusso & Conway LLP, 300 Old Country Rd., Suite 341, Mineola, NY 11501. Defendant Francisco Ramos is represented by Gary S. Villanueva, Gary S. Villanueva, Attorney at Law, 401 Broadway, Room 1503, New York, NY 10013. Defendant Wilber Ayala-Ardon is represented by Terrence P. Buckley, Esq., 356 Veterans Memorial Highway, Suite 8N, Commack, NY 11725.